**Fred HAGENY**

v.

**The UNITED STATES.**

No. 12–73.

United States Court of Claims.

Jan. 25, 1978.

Earl A. Charlton, Milwaukee, Wis., attorney of record, for plaintiff; Charlton, Gronowski, Welcenbach & Stanich, Milwaukee, Wis., of counsel.

Ray Goddard, Washington, D. C., with whom was Asst. Atty. Gen., Barbara Allen Babcock, Washington, D. C., for defendant.

Before COWEN, Senior Judge, and NICHOLS and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's exceptions to the recommended decision of Trial Judge Thomas J. Lydon, filed March 14, 1977, pursuant to rule 134(h), having been submitted to the court on oral argument of counsel and the briefs of the parties. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth,* it hereby affirms and adopts the decision as the basis for its judgment in this case.** It is, therefore, concluded that defendant is entitled to recover on its first

counterclaim the sum of $3,488.84 and judgment is entered for defendant against plaintiff in that amount. Defendant is not entitled to recover on its second counterclaim and special plea in fraud and they are hereby dismissed. Further, implementing the court's judgment order of January 9, 1976, entered in this case, it is concluded that plaintiff is not entitled to recover on the claims asserted in his petition and the petition is hereby dismissed.

## OPINION OF TRIAL JUDGE

LYDON, Trial Judge:

Plaintiff, Fred Hageny, filed a petition in this court seeking to recover damages attributable to the suspension of a contract he had with the Forest Service, Department of Agriculture. Under this contract, plaintiff purchased the right to cut and remove some 1,390,500 board feet of timber from designated trees in the Eagle River Ranger District, Nicolet National Forest, Vilas County, Wisconsin. The suspension of plaintiff's right to continue work on the contract was based on his alleged "unauthorized tree marking" during the course of contract performance.

In its amended answer to the petition, defendant asserted two counterclaims and a special plea in fraud. Under its first counterclaim, defendant sought to recover $3,488.84, based on a provision in the contract, because of plaintiff's unauthorized cutting and removal of 278 trees during contract performance. This figure represented the double stumpage value of the 278 trees. Under its second counterclaim, defendant sought to recover $556,000 ($2,000 × 278 trees) and double damages of $6,977.68 ($3,488.84 × 2) on the authority of the False Claims Act, 31 U.S.C. §§ 231–35. In support of its second counterclaim, defendant alleged that "Fred Hageny and divers other persons, combined and conspired to defraud the Government of the

---

* The concurring opinion of Judge Nichols follows the opinion of the trial judge which has been adopted by the court.

** Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed March 14, 1977, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

United States by illegally marking and/or cutting and removing 278 trees and attempted to perpetrate 278 separate frauds and false claims knowing the same to be false, fictitious and fraudulent." In its special plea in fraud, defendant asked the court to declare the claims advanced by plaintiff in his petition as forfeited to the United States, pursuant to the provisions of 28 U.S.C. § 2514 because plaintiff "has practiced, or attempted to practice, fraud against the United States in the presentation * * * of its claims in its petition."

By order dated January 9, 1976, on a Rule To Show Cause, the court concluded, as a matter of law, that plaintiff was not entitled to recover on his petition. Defendant's two counterclaims were remanded to the trial judge for trial and subsequent findings of fact, conclusions of law, and opinion thereon. Dismissal of plaintiff's petition was deferred, pursuant to Rule 102(d), until final action was taken on the counterclaims. With the denial of recovery to plaintiff on the claims advanced in his petition, and the dismissal herein of said petition, defendant's special plea in fraud seeking forfeiture of said claims is rendered moot. Accordingly, defendant's special plea in fraud is no longer considered viable and is herein dismissed.

Consideration of defendant's first and second counterclaims has been largely a factual inquiry. Resolution of the questions presented by these counterclaims has been governed in large part by defendant's ability, or inability, to meet the burden of proof cast upon it by the nature of the counterclaims it pleaded. On the trial record, it has been concluded that defendant, by a preponderance of the evidence, met its burden of establishing a right to recover from plaintiff the sum of $3,488.84 under its first counterclaim. On the other hand, defendant has failed to meet its burden of establishing, by clear and convincing evidence, that plaintiff violated the False Claims Act, *supra*, so as to justify recovery

under its second counterclaim. The reasons for these conclusions are hereinafter set forth in this opinion.

I

In 1969, and for some time prior thereto, plaintiff, operating in an individual capacity, had been in the business of logging timber.[1] He had logged timber under six different contracts with the Forest Service prior to November 1969. Four of these contracts were clear-cut timber sale contracts and the other two contracts were selective-cut timber sale contracts. Under a clear-cut timber sale contract, a contractor purchases the right to cut and remove all the timber located within the sale area. Under a selective-cut timber sale contract, a contractor purchases the right to cut and remove only selected and designated timber within the sale area. On this record, it is concluded that plaintiff satisfactorily performed all timber sale contracts he had with the Forest Service prior to November 1969.

The Nicolet National Forest was managed and protected by the Forest Service, Department of Agriculture. The Forest itself was divided into Ranger Districts. Each District was supervised by a Forest Ranger. At all times material herein, Gary H. Keppen (Keppen) was the Forest Ranger in charge of the Eagle River Ranger District, which District was located in the northeast section of Wisconsin. Keppen's duties included, *inter alia*, the preparation of Information For Bids (IFB) relative to sale of Forest timber and the administration of timber sale contracts.

Sometime in 1968, an area of roughly 483 acres in the Eagle Lake Ranger District was designated by the Forest Service as the site for a prospective timber sale. This sale area was broken down into four Payment Units. The perimeter of the sale area and the perimeters of the Payment Units were identified by blue paint markings on perimeter trees. This timber sale was known to

---

1. The facts are set out in exhaustive detail in the Findings Of Fact. Only a brief summary of those facts are set out hereinafter, sufficient, it is believed, to place the contentions of the parties in proper perspective.

all concerned as the Kentuck Lake Sale. It was to be a selective-cut timber sale.

In order to obtain information necessary for the preparation of an IFB on the Kentuck Lake Sale, Keppen cruised the sale area. Thereafter, he took a crew of Forest Service employees into the sale area and marked those trees which were to be cut by the successful bidder. Appropriate data was taken relative to each marked tree which subsequently was translated into meaningful information on the IFB on which bidders would act. The trees selected to be cut and removed from the sale area were marked by the Forest Service crew with a special orange paint in two places, i. e., at eye level (roughly diameter breast high (DBH)) and at the stump. This orange paint was manufactured especially for the Forest Service by the Nelson Paint Company, Iron Mountain, Michigan, and was not available for sale to the general public. The paint contained certain tracer elements which would surface when the paint was subjected to analysis tests. Characteristically, this paint had a dull orange appearance. Use of this special orange paint enabled the Forest Service to verify whether or not trees marked for cutting and removal in the Nicolet National Forest had been properly marked by Forest Service personnel or improperly marked by other persons. The Forest Service had been plagued by improper tree marking in the Nicolet National Forest and use of this special orange paint was one attempt to combat this problem.

The IFB on the Kentuck Lake Sale produced two bids. Since plaintiff's bid was the high one, he was awarded a contract on November 25, 1969, wherein for a total price of $31,426.50 he was given the right to cut designated trees, i. e., trees "marked with orange paint at DBH and on the stump" within the confines of the sale area.[2] Under the contract, plaintiff was to pay the Forest Service the purchase price applicable to each Payment Unit prior to cutting and removing the designated trees on said Unit. When all the designated trees were cut and removed from that Payment Unit and the logging work thereon was approved by the Forest Ranger, the next Payment Unit would become available to the contractor, and upon payment of the purchase price applicable thereto he would commence cutting and removing designated trees from this Payment Unit. The contract work sequence was as follows: Payment Unit No. 1 (Purchase Price—$10,727.50, comprising about 170 acres); Payment Unit No. 4 (Purchase Price—$4,428.00, comprising about 67 acres); Payment Unit No. 2 (Purchase Price—$9,411.50, comprising about 148 acres); Payment Unit No. 3 (Purchase Price—$6.859.50, comprising about 85 acres).

Around the first of July 1970, plaintiff paid the Forest Service the purchase price applicable to Payment Unit No. 1 and commenced logging in said area. After completing logging activities in Payment Unit No. 1, plaintiff so advised Keppen. Keppen thereafter went about inspecting the logging operations in this Unit. Before giving his approval as to contract performance in this Unit, Keppen was alert to insure that all marked trees were cut; that any unmarked trees that were cut were recorded in a scale book Keppen maintained together with appropriate data which would enable determination at a later time of the value of said trees; and that any other irregularities in contract performance were noted for appropriate action. For example, before approving Payment Unit No. 1, Keppen required plaintiff to clean up logging slash in the Unit. Thereafter, plaintiff paid the purchase price applicable to Payment Unit No. 4 and logged that Unit. After Keppen approved the logging operations in Payment Unit No. 4, plaintiff paid the purchase price applicable to Payment Unit No. 2 and began logging operations in that Unit. Keppen conscientiously checked out Pay-

2. Under the contract, plaintiff also had the right to cut certain undesignated trees such as aspen and balsam fir trees. In general the designated trees were hardwood trees and it was estimated that the great majority of the timber sale trees were hardwood trees. The undesignated trees were primarily pulpwood trees.

ment Unit Nos. 1 and 4 before approving the conduct of logging operations thereon. However, his approval in this regard only meant that he had satisfied himself that all logging activities were conducted properly and in reasonable accord with the terms of the contract. It did not mean he had inspected every stump and/or tree in the Units. It was in Payment Unit No. 2 that wet paint was discovered relative to logging operations, which discovery provided the foundation for this litigation.

As indicated earlier, plaintiff contracted in his individual capacity. In performing the Kentuck Lake Sale contract, plaintiff utilized the services of three crews. Each crew consisted of a cutter, i. e., one who fells the tree and thereafter cuts the tree into logs, and a skidder, i. e., one who operates a piece of machinery (called a skidder) which drags the logs from the woods to a road from which they can be transported to a lumber mill and/or buyer. Without elaboration, these crews can properly be considered independent contractors. The crews negotiated with plaintiff relative to the price of their services. These negotiations generally centered on the price per timber cord or thousand board feet (MBF) to be paid for timber cut and removed from the sale area. In essence, payment to them was based on the amount of timber they cut and removed from the woods. The more timber the crews cut and removed, the more money the crews made. Plaintiff did not withhold any payments from these crews for purposes of unemployment compensation. Moreover, these crews, by and large, worked when they pleased and were practically unsupervised in their logging operations. On this record, it is reasonably clear that plaintiff did not supervise to any degree the logging operations taking place on the Kentuck Lake Sale.

On the morning of December 4, 1970, Keppen discovered wet paint on the stump of a cut tree as well as on two standing trees in Payment Unit No. 2 in an area where Neal Marvin, a cutter, and his cousin Ronald Marvin, a skidder, were working. The trees were painted in the manner followed by the Forest Service, i. e., at DBH and at the stump. There was a foot of recent snow on the ground, and because of the absence of any other tracks in the area, it seemed reasonable to conclude that the Marvins, who were working in that area that morning, were responsible for the painting of those trees. However, the Marvins denied painting the trees when questioned by Keppen at that time.[3]

Keppen, on December 4, 1970, took paint samples from the wet paint on the stump and on one tree. These paint samples were analyzed by the Nelson Paint Company and found to be non-Forest Service paint. On December 11, 1970, Keppen took paint samples from eight more marked trees in the same area of Payment Unit No. 2. Analysis of these paint samples showed seven of the trees had been marked with Forest Service paint whereas one tree had been marked with non-Forest Service paint.

Keppen decided to investigate plaintiff's logging operations in Payment Unit Nos. 1, 4 and 2 more thoroughly. However, deep snows precluded any such investigation. Keppen, therefore, decided to wait until spring and then perform a recruise of these Units, examining tree stumps and trees for evidence of improper timber logging operations by plaintiff.

Confirmation of the fact that non-Forest Service paint was being used to mark trees suggested the commission of a possible trespass on property of the United States. Accordingly, Keppen was required to prepare, and he did prepare, a Trespass Report dated

3. Keppen first met with plaintiff, after the December 4 incident, on December 11, 1970, at the time of this meeting, plaintiff had been told by the Marvins that they had, in fact, painted these trees. However, plaintiff did not tell Keppen about this revelation because he felt Keppen already knew it since the only persons in the area on the morning of December 4 were the Marvins, and it should have been obvious to anyone that the Marvins painted the trees. Further, plaintiff felt Keppen was out to pin the tree marking incident on him and thus he refused to cooperate in any way with Keppen by voluntarily supplying information. The record indicates clearly that the Marvins painted the trees in question on their own initiative.

January 8, 1971. By letter dated January 8, 1971, Keppen notified plaintiff that his contract was suspended "until further notice in writing by the Forest Supervisor * * * because of the unauthorized tree marking discovered on 12/4/70."[4] This letter was sent so that a complete investigation of plaintiff's logging operations of Payment Unit Nos. 4, 1 and 2, by way of a recruise, could be conducted.

In April 1971, Keppen and his Forest Service crew performed a thorough, controlled and reliable recruise of Payment Unit Nos. 4, 1 and 2. The recruise was conducted on the assumption that the results thereof might be subjected to the scrutiny of litigation. Further, all doubts about whether a stump or tree was improperly marked or whether a stump was marked at all were to be resolved in favor of plaintiff. All stumps in these Units were examined. Marked trees which had not been cut were also examined.[5] The recruise crew took paint samples from suspected paint on stumps and trees. In this endeavor, the judgment and discernment of the crew governed. In general, Forest Service paint, as indicated previously, had a dull orange color. Non-Forest Service paint, on the other hand, had a brighter orange color. These general facts controlled, for the most part, the crew's determinations of whether paint on a stump or on a tree was suspect so as to justify taking a sample thereof for analysis. While there was room for error in the recruise effort, the record justifies reliance on the recruise results as fairly and reasonably portraying the logging operations conducted on Payment Unit Nos. 4, 1 and 2.

Some 8,970 hardwood stumps were examined during the recruise effort. Two-hundred and nine (209) paint samples were taken from these stumps as well as from standing trees. Analysis by the Nelson Paint Company revealed that 52 stumps had been painted with non-Forest Service paint. This supported a conclusion that 52 trees had been improperly marked, cut and removed from Nicolet National Forest during the course of plaintiff's logging operations in Payment Unit Nos. 4, 1 and 2. The 52 improperly marked and cut trees were broken down as follows: 8 stumps in Payment Unit No. 4; 36 stumps in Payment Unit No. 1; and 8 stumps in Payment Unit No. 2.

Examination of the 8,970 stumps during the recruise established that 226 stumps had not been painted (marked) at all and justified the conclusion that these 226 unmarked trees were cut and removed from the Nicolet National Forest without contractual authorization during the course of plaintiff's logging operations in Payment Unit Nos. 4, 1 and 2. As to these 226 stumps, 36 stumps were located in Payment Unit No. 4; 105 stumps in Payment Unit No. 1; and 85 stumps in Payment Unit No. 2.

The record preponderates in favor of a finding that plaintiff, operating through 3 two-man crews, cut and removed from Payment Unit Nos. 4, 1 and 2 some 278 trees which were not designated for cutting and

---

4. Plaintiff never did complete the contract. With the approval of the Forest Service, plaintiff's brother, Don Hageny, was allowed, after payment of the purchase price applicable to Payment Unit No. 3, to complete the contract by cutting and removing appropriate trees from said Payment Unit. It would appear from the record that plaintiff had no desire to complete the contract and the Forest Service had no thoughts of allowing him to do so. However, there is no correspondence subsequent to January 8, 1971, in the record of further dealings between plaintiff and the Forest Service, relative to plaintiff's future performance of the contract.

5. The recruise results showed that 18 standing trees in Payment Unit Nos. 1 and 2 standing trees in Payment Unit No. 2 were marked with non-Forest Service paint. The record does not indicate whether any standing trees marked with Forest Service paint were discovered during the recruise. As to Payment Unit No. 1, there is no explanation why these 18 trees were not cut and removed or why these standing marked trees were not detected by Keppen when he approved logging operations in the Unit. The presence of these standing marked trees raises an unanswerable question of whether or not these trees were painted after plaintiff had completed logging operations in Payment Unit No. 1.

removal by the contract which he had with the Forest Service. The stumpage value of these 278 trees was determined to be $1,744.42. The 226 unmarked trees which were cut and removed had a stumpage value of $1,438.22. The 52 improperly marked trees had a stumpage value of $302.20. The record justifies a finding that the Forest Service stumpage value determinations as to these 278 trees were reliable and fair.

Under the contract, plaintiff agreed to pay double stumpage value for each undesignated tree he cut and removed from Nicolet National Forest during his logging operations. The double stumpage value of the 278 trees referred to above was $3,488.84 ($1,744.42 × 2). Although the Forest Service billed plaintiff for the double stumpage value of the 278 undesignated trees he cut and removed from the Forest, plaintiff has so far failed to pay for these trees.

## II

■ The record in this case supports recovery by defendant on its first counterclaim in the sum of $3,488.84. The contract clearly provided that for each undesignated tree cut and removed from the Kentuck Lake Sale area, plaintiff would pay the Forest Service the double stumpage value of each such tree (contract provision BT3.23). Plaintiff was fully conversant with the language, operation and reach of this contract provision. Further, the cutting and removal of undesignated trees were the subject of discussion between plaintiff and Keppen. Both men agreed on how undesignated trees cut and removed from the sale area would be handled, i. e., the Forest Service would bill plaintiff at the end of the contract for each undesignated tree cut and removed at the double stumpage value of said tree. There is no

dispute over the interpretation and operation of the contract provision in question. The question to be resolved is whether plaintiff did in fact cut and remove 278 undesignated trees from the sale area.

The recruise effort established with a degree of reliability that 278 undesignated trees were cut in the sale area. The record preponderates in favor of a finding that these 278 trees were removed from the sale area by the logging crews engaged by plaintiff.[6] Under the contract provision, agreed to by the parties, covering the cutting and removal of undesignated trees, plaintiff was required to pay the double stumpage value of these 278 trees.

The double stumpage value determinations by the Forest Service of the 278 trees in question were not seriously challenged by plaintiff. The record indicates these value determinations were arrived at in a fair, reasonable and objective manner. The double stumpage value of the 278 trees is found to be $3,488.84. Defendant is therefore entitled to recover that amount.

## III

### A

Defendant's second counterclaim, based on the False Claims Act, 31 U.S.C. §§ 231–35 (1970), seeks to recover from plaintiff forfeiture payments of $556,000 (278 trees × $2,000) and double damages of $6,977.68 ($3,488.84 × 2). Section 231 of the False Claims Act provides in pertinent part as follows:

> Any person * * * who shall make or cause to be made, or present or cause to be presented, for payment or approval [to an officer of the United States], any claim upon or against the Government of

---

6. Plaintiff concedes that he should pay for undesignated trees cut and removed from the sale area. However, he claims that many trees were stolen from him and thus it would be unfair to assess him double stumpage value for trees which he never received. There is no reliable evidence in the record as to theft of trees from the sale area. Accordingly, there is no basis for such a contention. Plaintiff further claims that as to the 226 unmarked trees,

it was possible for the weather and/or logging operations to obliterate a paint mark and thus possible for some of these 226 trees to have been properly marked at the time of cutting. The odds favoring this possibility were greatly reduced, if not eliminated, by the careful manner in which the recruise was conducted and the rationale underscoring the recruise effort of resolving all doubts in favor of plaintiff as to whether a tree had been marked or not.

the United States, or any department or officer thereof, knowing such claim to be false, fictitious or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim, \* \* \* shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; and such forfeiture and damages shall be sued for in the same suit. [*See Miller v. United States*, 550 F.2d 17, 18–19, 213 Ct.Cl. 59, 61–62 (1977) for the official text of the Act as set out in the Revised Statutes.]

■ Defendant seeks to give the False Claims Act provision, *supra*, a very broad application so as to embrace any type of fraudulent act, without qualification, that results in a monetary or property loss to the United States. It relies, in this regard, on its reading of *United States v. Bornstein*, 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976); *United States v. Neifert-White Co.*, 390 U.S. 228, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968) and a number of other District Court and Court of Appeal decisions. However, it

is clear that the False Claims Act was not designed to reach every kind of fraud practiced on the government. *United States v. McNinch*, 356 U.S. 595, 599, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958); *see also United States v. Marple Community Record, Inc.*, 335 F.Supp. 95, 99–100 (E.D.Penn.1971); *Cahill v. Curtiss-Wright Corp.*, 57 F.Supp. 614, 616 (W.D.Ky.1944).

The above observation raises a question that must be considered initially in this case, *i. e.*, whether the conduct of plaintiff on which defendant relies constitutes a claim, or claims, within the purview of the False Claims Act. Plaintiff has not addressed himself to this question and one might accordingly assume that he considers the alleged conduct to fall within the ambit of the Act. Since plaintiff did not confront this question, defendant's brief has met the substance of this question with broad generalizations supported by statements it has found in the various False Claims Act decisions it has cited. These supporting statements must be read in the context of the factual circumstances in which they were rendered. In every case relied on by defendant the conduct complained of included the submission in one form or another of an alleged fraudulent document, considered to be a claim, upon which governmental action was sought.[7] It has been observed that the phrase "claim upon or against the Government of the United States" in the False Claims Act normally connotes a demand for money or for some transfer of public property which is presented for payment or approval to an officer of the United States, *United States v. McNinch, supra*, 356 U.S. at 599, 78 S.Ct. 950. *See also United States*

---

7. *See*, for example, *United States v. Bornstein*, 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976), *United States v. Cherokee Implement Co.*, 216 F.Supp. 374 (N.D.Iowa 1963) and *United States v. Gardner*, 73 F.Supp. 644 (N.D.Ala. 1947) [invoices]; *United States v. McNinch*, 356 U.S. 595, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958), *cf. United States v. Neifert-White Co.*, 390 U.S. 228, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968) [loan applications]; *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943) and *Murray & Sorenson, Inc. v. United States*, 207 F.2d 119 (1st Cir. 1953) [contract bids]; *United States v. Cohn*, 270

U.S. 339, 46 S.Ct. 251, 70 L.Ed. 616 (1926); *United States v. Cooperative Grain & Supply Co.*, 476 F.2d 47 (8th Cir. 1973) and *Alperstein v. United States*, 291 F.2d 455 (5th Cir. 1961) [various applications]; *United States v. National Wholesalers*, 236 F.2d 944 (9th Cir. 1956), *cert. denied*, 353 U.S. 930, 77 S.Ct. 719, 1 L.Ed.2d 724, and *Faulk v. United States*, 198 F.2d 169 (5th Cir. 1952) [labels]; *United States v. Collyer Insulated Wire Co.*, 94 F.Supp. 493 (D.R.I.1950) [test reports and/or vouchers]. *See also Miller v. United States*, 550 F.2d 17, 213 Ct.Cl. 59 (1977). [consolidated billings].

*v. Tieger*, 234 F.2d 589, 590–92 (3d Cir. 1956). *United States v. Marple Community Record, Inc., supra*, 335 F.Supp. at 99.

It is clear in this case that plaintiff did not submit in any form, written or otherwise, a "claim" seeking to recover money or property from the government. Defendant does not argue to the contrary. The conduct on which defendant relies, and on which it premises its False Claims Act counterclaim, involves the cutting and removal by plaintiff's logging crews of undesignated trees from the Nicolet National Forest. While the cutting and removal of these trees was not authorized by contract or otherwise, it was viewed as a trespass by the Forest Service, and indeed may have constituted a wrongdoing against the government (*e. g.*, tort, or conversion, or deceit, or theft), no manifestation of the submission of a claim—formal or informal—preceded and/or accompanied and/or followed accomplishment of the act of cutting and removing said trees.

Defendant admits that claims within the purview of the False Claims Act are generally presented in some written form which seeks to recover money or property from the government. However, it argues that the Act should not be so restrictively or rigidly read. It maintains, in essence, that any fraudulent conduct involving loss of government property, whether manifested in some written form or by conduct without any written predicate, falls within the ambit of the Act. Defendant would have the fraudulent conduct itself constitute the "claim" regardless of whether governmental approval of such conduct, in one form or another, was sought. Under this view, a simple theft of government property would constitute a "claim" within the ambit of the False Claims Act. However such a broad view of the term "claim" does not seem warranted by the legislative history of the False Claims Act or by case law. Indeed, the Supreme Court has cautioned that the words "claim against the Government" in the False Claims Act "must be carefully restricted, not only to their literal terms but to the evident purpose of Congress in using those terms, particularly where they are broad and susceptible to numerous definitions * * *." *United States v. McNinch, supra*, 356 U.S. at 598, 78 S.Ct. at 952.

In support of its position, defendant, for example, relies on the following statement to be found in *United States v. Neifert-White Co., supra*, " * * * the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government. * * * " (390 U.S. at 232, 88 S.Ct. at 961.)[8] However, this broad statement is tempered by the language in *United States v. McNinch, supra*, wherein the Supreme Court observed " * * * At the same time it is equally clear that the False Claims Act was not designed to reach every kind of fraud practiced on the Government. * * * " (356 U.S. at 599, 78 S.Ct. at 953.)

In my opinion, a serious question exists as to whether the alleged conduct of plaintiff, relied on by defendant, constitutes a "claim" within the purview of the False Claims Act. However, under the circumstances of this case, resolution of such a question can be, and therefore should be, pretermitted. This action is deemed warranted because plaintiff has not challenged the application of the False Claims Act to the conduct in question, and more importantly, the matter has been fully tried on the merits and the decision reached herein on the merits serves to obviate the necessity for deciding the question. Accordingly, for purposes of decision herein, it has been as-

---

8. The language in the *Neifert-White Co.* case must be read in the context of the issue in that case. The question in that case was whether a "claim" (loan application to Commodity Credit Corporation), within the meaning of the False Claims Act, must be read in a narrow sense so as to embrace only claims or demands for favorable action by the government on loan applications for payments due and owing from the government. The Supreme Court rejected such a narrow reading of the term "claim" and held it covered any claim or demand for favorable action by the government upon a loan application regardless of whether existing payments were due and owing from the government. It was in this context that the language relied on by defendant was utilized.

sumed, but not decided, that the conduct of plaintiff upon which defendant relies constitutes a "claim" within the meaning of the False Claims Act.

## B

The degree of proof necessary to establish fraud demands more than a preponderance of the evidence. *First National Steamship Co. v. United States*, 106 Ct.Cl. 601, 621–22 (1946). Indeed, it is clearly established that defendant has the burden of proving by "clear and convincing" evidence that plaintiff's conduct constituted fraud against the government within the purview of the False Claims Act. *Law v. United States*, 195 Ct.Cl. 370, 440–41 (1971); *Eastern School v. United States*, 381 F.2d 421, 432, 180 Ct.Cl. 676, 694 (1967). Defendant's burden is such that the evidence of record must be so clear and convincing that the mind can rest with safety upon a finding that fraud has been established. *New York Market Gardeners' Ass'n v. United States*, 43 Ct.Cl. 114, 138 (1908). On this record, it is concluded defendant has failed to carry the heavy burden imposed on it in this regard.

Defendant's fraud claim against plaintiff rests on the charge that plaintiff and other persons combined and conspired to defraud the government by illegally marking and/or cutting and removing 278 trees from the Nicolet National Forest. As indicated earlier, 226 unmarked trees were cut and removed from the sale area, and 52 improperly painted (marked) trees were cut and removed from the sale area. While defendant directs its fraud charge at the 278 cut and removed trees, the facts require that the two categories of trees, *i. e.*, unmarked trees and improperly painted trees, be discussed separately.

As to the unmarked trees cut and removed, it is difficult to find the ingredients necessary to support a fraud charge. To begin, the cutting of unmarked trees in the Nicolet National Forest during performance of a timber sale contract was not unusual. Logging operations sometimes required the cutting of unmarked trees. At other times accidents or mistakes resulted in the cutting of unmarked trees. Undoubtedly there were occasions when unmarked trees were deliberately cut for their timber content. More importantly, a provision of the contract between plaintiff and the Forest Service covered such occurrences.

Plaintiff and Keppen, the Forest Ranger, discussed the cutting of undesignated trees, and both agreed on how such occurrences were to be handled. It was agreed between plaintiff and Keppen, by contract and by conduct, that all unmarked (undesignated) trees cut and removed during contract performance by plaintiff would be paid for by plaintiff at the end of the contract at double stumpage value rates. Keppen maintained a scale book in which he noted data applicable to unmarked trees he discovered plaintiff's crews had cut and removed during the logging operations. The data he recorded in this scale book enabled the Forest Service to determine at a later date the stumpage value of said trees.

Keppen, after an inspection, approved contract performance in Payment Unit Nos. 1 and 4 knowing that unmarked trees had been cut and removed by plaintiff's logging crews, although he did not know at the time he approved logging operations in these two Units that 141 unmarked trees had been cut and removed.[9]

Keppen testified that if he had discovered, during the course of policing Payment

---

**9.** As to Payment Unit Nos. 1 and 4, Keppen testified he had recorded in his scale book data relative to some 12 unmarked cut and removed trees he discovered while policing contract performance in those Units. Keppen considered 11 of these trees to have been cut unintentionally and one tree to have been cut intentionally. Keppen's scale book was not made a part of the record in this case. It could be that a greater number of unmarked cut trees were recorded therein than Keppen's testimony, based on memory, reflected. It is not unreasonable to conclude from the record that greater scrutiny by Keppen of plaintiff's logging operations would have revealed a greater number of cut and removed unmarked trees. There is no evidence that plaintiff or his crews attempted to conceal by overt acts or otherwise the cutting and removing of the 226 unmarked trees in issue.

Unit Nos. 1, 4 and 2, that some 226 unmarked trees had been cut and removed by plaintiff's logging crews he would handle them as outlined above.[10] Keppen testified that if wet paint had not been discovered on trees in Payment Unit No. 2, he did not believe there would be any issue as to the 226 unmarked trees cut and removed—he would merely bill plaintiff at the end of the job for the value of the 226 trees at double stumpage rates. His testimony in this regard militates against any finding of fraud as to the cutting and removal of the 226 unmarked trees.

■ There is absolutely no evidence in the record relative to an agreement or conspiracy on the part of plaintiff and his crews to deliberately cut and remove unmarked trees from the sale area. Defendant has not established that there was a scheme or a plan or an effort to defraud the government by cutting and removing unmarked trees from the sale area. Plaintiff agreed to pay for each and every unmarked tree the logging crews cut and removed and the Forest Service agreed to bill him for each and every unmarked tree cut and removed.[11] Since the parties agreed on the manner in which the cutting and removal of unmarked trees would be handled, there is no basis for a finding of fraud because unmarked trees were, in fact, cut and removed. Evidence of fraud must be clear and convincing, *Klein v. United States*, 285 F.2d 778, 786, 152 Ct.Cl. 8, 23 (1961). Here, there is no evidence of fraud relative to the 226 unmarked trees which were cut and removed from the sale area.

The record is barren of any meaningful evidence relative to the cutting and removal of the 226 unmarked trees. The conduct of plaintiff on which defendant relies in support of its fraud charge does not involve the 226 unmarked trees cut and removed from the sale area. Instead, this conduct centers on the 52 trees improperly painted with non-Forest Service paint which were cut and removed from the sale area. Defendant merely lumps the 226 unmarked trees which were cut and removed with the 52 improperly painted trees which were cut and removed and applies the fraud charge indiscriminately to both categories of trees. As indicated above, a finding of fraud as to the cutting and removal of 226 unmarked trees cannot be made on this record. Attention must now turn to the conduct relied on by defendant to support its fraud claim as to the 52 improperly painted trees.

■ Defendant maintains that plaintiff engaged in a fraudulent scheme to defraud the government by improperly painting (marking) and thereafter cutting and removing some 52 trees from the sale area. In support of this charge, defendant relies on the following testimonial evidence.

Defendant produced James M. Johnson of Crandon, Wisconsin, as a witness. The substance of Johnson's testimony was that in the summer or early fall of 1970, he drove to a wooded area with plaintiff and Douglas James Champine for the purpose of painting trees. As noted earlier, plaintiff had been awarded the Kentuck Lake Sale con-

---

**10.** He also testified he would have exercised greater scrutiny in his policing activities had he known that a large number of unmarked trees were being cut and removed. Moreover, he operated on the general assumption that unmarked trees were cut unintentionally. If he believed unmarked trees were being deliberately cut, he would take the matter up with the contractor. There is absolutely no evidence in the record that each of the 226 trees was deliberately cut and removed by plaintiff. Plaintiff testified that he did not intentionally cut unmarked trees. As to the one unmarked tree that Keppen felt was intentionally cut there is testimony in the record that it was unintentionally cut to free a felled tree that had lodged itself in the unmarked tree. On this record,

defendant has failed to carry its burden of proving that plaintiff or his crews deliberately and intentionally cut and removed 226 trees from the Nicolet National Forest.

**11.** The fact that plaintiff did not pay for the 226 unmarked trees when billed by the Forest Service neither adds to nor detracts from the question of whether plaintiff committed fraud against the government in cutting and removing these trees. By awarding defendant a judgment on its first counterclaim, the court has, in effect, required plaintiff to live up to its contractual agreement and pay the bill submitted by the Forest Service for the cutting and removal of those trees.

tract on November 25, 1969, although he did not commence logging operations until July 1970. Johnson testified that he and Champine painted trees for a couple of hours. Johnson claimed he painted around 100 trees himself. Johnson testified that plaintiff did not paint any trees. Indeed, according to Johnson, plaintiff never spoke one word to Johnson during the entire episode. According to Johnson, plaintiff walked through the woods while he and Champine were painting trees and occasionally plaintiff would motion with his hand toward a tree, which action indicated to Johnson he wanted that tree painted. Johnson testified that Champine told him they were on the Kentuck Lake Sale area and that plaintiff had the contract to cut the trees in this area.

Plaintiff, in his testimony, denied that he was with Johnson while Johnson was painting trees. Johnson also admitted that Champine disagreed with his testimony that they were painting trees in the Kentuck Lake Sale area. As detailed in the findings of fact, Johnson's demeanor as a witness was not persuasive. His testimony was inconsistent at times, hazy at times, and lacking in substantive and significant detail on matters which, had it been otherwise, might have added credibility to his overall testimony. More importantly, Johnson's crucial testimony connecting the site of the painting of the trees to the Kentuck Lake Sale area was based, not on personal knowledge, but on what Champine told him.

The conflicting testimony of plaintiff and Johnson serves to bring Champine to center stage. Pursuant to a standard pretrial order issued in the case under Rule 111, defendant listed Champine as a proposed witness in its pretrial submission. Defendant, however, did not call Champine as a witness, nor did defendant explain why it failed to call him as a witness. Under such circumstances, defendant's failure to call Champine as a witness supports an inference that his testimony would be unfavorable to defendant. *Estate of Ridgely v. United States*, 180 Ct.Cl. 1220, 1231 n. 5 (1967). Such an unfavorable inference corroborates Johnson's admission, noted *supra*, that Champine does not agree with his testimony as to the painting episode.

One other observation serves to cast doubt on the testimony of Johnson. The recruise results revealed that approximately 72 stumps and standing trees had been improperly painted in the sale area. Such results do not support Johnson's testimony as to the large number of trees he and Champine painted in the sale area.

The record relative to Johnson's testimony is conflicting. His testimony failed to engender a feeling of believability. It certainly failed to establish clearly and convincingly that plaintiff conspired to defraud the government by illegally painting trees, or causing trees to be painted, in the Kentuck Lake Sale area.

Defendant produced Lawrence Jack Wilson as a witness. Wilson was a member of one of the three crews plaintiff engaged to cut and remove trees from the sale area. Each crew consisted of a cutter, one who fells the tree and thereafter cuts the tree into logs, and a skidder operator. Wilson was a skidder operator, *i. e.*, he operated a machine, called a skidder, which dragged logs from the woods. Wilson's cutter at times material herein was Seldon Lykins. The substance of Wilson's testimony was that at some time while he was working in the sale area, plaintiff drove up in an automobile with his brother Tom Hageny in the passenger's seat. Tom Hageny got out of the car, took a quart can of orange paint from the front floor passenger side of the automobile and told Wilson to paint (mark) some of the nicer trees. Wilson agreed to do so. Plaintiff did not get out of the car, nor did plaintiff, according to Wilson, say anything to Wilson. Wilson offered no testimony as to whether plaintiff actually heard Tom Hageny's conversation with him. Wilson testified he painted a lot of timber in the sale area. He claimed he made no effort to conceal his tree painting activities from his cutter, Seldon Lykins, and he assumed Lykins knew he was painting trees.

Wilson's testimony was devoid of any time frame or sale area location relative to

the Tom Hageny incident and his subsequent painting activities. The findings of fact detail some of the problems created by Wilson's lack of testimonial preciseness in this regard. Wilson admitted he never had any conversations with plaintiff about painting trees. Indeed, he admitted plaintiff never told him to paint trees. He testified that plaintiff was not around much and that plaintiff never saw him painting trees and he never told plaintiff he was painting trees.

Plaintiff, in his testimony, denied that he was present at the time Wilson claims Tom Hageny gave him the quart of orange paint.

Wilson's testimony was not persuasive. His account of critical events, as indicated earlier, was lacking in reliable specificity as to time and place. Moreover, his account of painting a lot of timber does not comport in any reasonable way with the recruise results, a fact noted, *supra*, relative to Johnson's testimony. Further, there was no corroboration of Wilson's testimony in the record.

It seems reasonable to assume, as Wilson did, that Lykins would have known of Wilson's tree painting activity. As was the case with Champine, defendant listed Lykins as a proposed witness in its pretrial submission pursuant to Rule 111. However, defendant did not call Lykins as a witness, nor did defendant explain its failure to call him as a witness. Under the circumstances, it is reasonable to infer that Lykins' testimony would be unfavorable to defendant. *Estate of Ridgely v. United States, supra.*[12]

Wilson's testimony, when viewed in the light of the entire record, fails to show clearly and convincingly that plaintiff conspired to defraud the government by improperly painting trees, or causing trees to be painted, in the sale area. At best, it merely shows that Wilson may have painted trees in the sale area on his own initiative.

Defendant also produced as witnesses Neal Marvin and his cousin Ronald Marvin. The Marvins were one of the three crews which logged the timber for plaintiff on the Kentuck Lake Sale. Neal Marvin was a cutter and Ronald Marvin was a skidder. The Marvins were the ones who were caught painting trees in Payment Unit No. 2 on December 4, 1970 by Keppen. Defendant maintains that the testimony of the Marvins corroborates its contention that plaintiff masterminded a tree-stealing scheme to defraud the Forest Service. The record does not support such an assertion.

The Marvins admitted to painting trees in the Kentuck Lake Sale area during contract performance. Parenthetically, they had denied painting trees when confronted by Keppen on December 4, 1970, and thereafter. Their testimony was conflicting as to the number of trees they painted. Neal Marvin claimed he only painted some 10 to 12 trees at one point, and yet, at another point, claimed he painted some 50 trees. Neal Marvin claimed he never painted and cut a tree unless the tree was damaged by logging operations or was in the path of a skidder.[13]

The record supports a finding that the Marvins painted and cut trees in the sale area on their own initiative.[14] The Marvins

**12.** Neither party listed Tom Hageny as a witness in the pretrial submissions each made pursuant to Rule 111. The record does not indicate whether he was available for testimonial purposes, nor does the record provide any explanation why he was not called by either party as a witness. Under the circumstances, no inference will be drawn one way or another relative to his absence as a witness. *See McClure v. United States*, 48 F.Supp. 531, 98 Ct.Cl. 381, 388 (1943).

**13.** He claimed he took to painting trees because Keppen caught him cutting up an unmarked tree which he felt had to be cut be-

cause a properly marked tree fell, when cut, so as to become lodged in the unmarked tree (see n. 11, *supra*). Because Keppen upbraided him for cutting this unmarked tree, he decided to paint (mark) damaged or in-the-way trees in the future before cutting them and thereby, hopefully, avoid the wrath of Keppen. Neal Marvin was adamant in his testimony that he only painted, for cutting, damaged trees or trees in the skidder's way.

**14.** It is perhaps necessary to mention again that the crews utilized by plaintiff are best characterized as independent contractors. Plaintiff did not feel he had any control over

testified that neither plaintiff nor Tom Hageny ever told them, or asked them, or suggested to them, that they paint trees for cutting purposes in the sale area. The Marvins testified that neither plaintiff nor Tom Hageny ever gave them paint. Further, the Marvins did not believe that either plaintiff or Tom Hageny were ever in the woods when they painted trees. Contrary to the contention advanced by defendant, the testimony of the Marvins suggests that plaintiff was not involved in any tree painting that took place in the sale area.[15]

In his testimony, plaintiff stated that he never saw anyone painting trees in the sale area; that he never gave any paint to anyone for purposes of painting trees in the sale area; that he never told anyone to paint trees in the sale area; and that he never authorized anyone to paint trees in the sale area.

Plaintiff testified that it was common knowledge that loggers were painting and cutting trees in the Nicolet National Forest.

Keppen verified this fact in his testimony. Plaintiff testified that he wondered whether the crews he engaged painted and cut trees in the sale area during the course of the logging operations. However, he testified that he never knew this to be a fact until Keppen discovered wet paint on trees in Payment Unit No. 2 on December 4, 1970. *See Eastern School v. United States, supra,* 381 F.2d at 432–34, 180 Ct.Cl. at 695–96.[16] Plaintiff further testified that he had no control over the logging activities of the crews he engaged. He felt he could not run them off the job, even if he caught them painting trees, because of fear of reprisals against him.[17] However, he believed the Forest Service could handle the problem by barring from the woods those loggers who engaged in illegal tree painting.[18]

The testimonial evidence relied on by defendant to support its charge that plaintiff was part of a conspiracy and/or scheme to defraud the government of its property was conflicting, confusing, and lacking in proba-

---

the crews while they were in the woods. They negotiated with plaintiff relative to the price at which they would agree to cut and haul timber from the woods. This price was based on the number of board feet of timber logged by the crews. As a result, the more timber the crews cut and hauled from the woods, the more money the crews would make. Of course, it also meant more money to plaintiff when he sold the timber. However, the fact that each crew benefited from the volume of timber cut and removed from the sale area serves to discredit defendant's contention that plaintiff was the primary beneficiary of unauthorized tree cutting and removal. Under the circumstances of this case, it would not be reasonable to impute the improper tree painting activities of the logging crews to plaintiff. *Cf. Wagner Iron Works v. United States,* 174 F.Supp. 956, 958–59, 146 Ct.Cl. 334, 337–39 (1959).

15. The Marvins were not viewed as impressive witnesses. There were some inconsistencies in their testimony, and their initial denial of any involvement in tree painting in the sale area served to reduce their overall credibility rating.

16. Plaintiff's testimony revealed that he was fully acquainted with the "tricks" of the logging trade. His demeanor and testimony generated a suspicion on the part of the trier of fact that he knew what was going on in the woods, *i. e.,* that tree painting was going on to some degree in the sale area. This suspicion does not embrace speculation that he therefore

must have ordered, directed, controlled, or encouraged tree painting in the sale area. Suspicion and speculation, however, do not rise to the level of clear and convincing evidence. A finding of fraud must rest on something more substantial than suspicion or speculation. *See Dubois Constr. Corp. v. United States,* 98 F.Supp. 590, 597, 120 Ct.Cl. 139, 175 (1951); *Terrill v. United States,* 35 Ct.Cl. 218, 222 (1900). Indeed, even a hint of fraud will not support a finding of fraud, *see Eastern School v. United States, supra,* 381 F.2d at 434, 180 Ct.Cl. at 698, nor will the existence of fraud be presumed. *DeLuca v. United States,* 69 Ct.Cl. 262, 264, *cert. denied,* 282 U.S. 862, 51 S.Ct. 36, 75 L.Ed. 763 (1930).

17. On December 13, 1970, two of plaintiff's skidder machines were burned in the sale area not far from where the wet paint was discovered on December 4, 1970. Plaintiff pointed to this occurrence as an example of the form a reprisal could take.

18. Plaintiff was quite upset with the fact that although the Marvins had been caught painting trees in the sale area, Keppen, while prohibiting them from working in that area of Payment Unit No. 2 where the wet paint incident on December 4, 1970, took place, did allow the Marvins to continue logging timber in other parts of the sale area after said incident.

tive reliability. *See W. H. Harrison Co. v. United States,* 101 Ct.Cl. 413, 418–20 (1944). Under no reading of the record in this case can this testimonial evidence be considered clear and convincing evidence that plaintiff practiced, or attempted to practice, fraud against the United States in the performance of his timber sale contract with the Forest Service. Defendant has failed to meet the heavy evidentiary burden cast upon it relative to the fraud charge it has pleaded in this case. *See Law v. United States, supra,* 195 Ct.Cl. at 440–42, 445–49, 453; *Eastern School v. United States, supra,* 381 F.2d at 431–34, 180 Ct.Cl. at 694–98. Defendant's second counterclaim must be dismissed.

NICHOLS, Judge, concurring:

I concur in the result. I agree as to defendant's first counterclaim. As to the second, I think the court should have adopted the trial judge's analysis of the False Claims Act in part III A of his opinion, except for the last three sentences thereof. These I would strike, and substitute a flat statement that plaintiff's acts as asserted by defendant did not constitute false claims under the statute, 31 U.S.C. §§ 231–235. This would render the discussion in part III B moot.

As to the removal of 226 unmarked trees, this, if wrongful, was simple larceny. Plaintiff misused his right to go into the forest for the marked trees, to steal others he found there. No false assertion was made by word or act. As regards the 52 falsely marked trees, analysis in more depth is required, but essentially larcenous conduct is likewise revealed. False marking may be the basis of a False Claims Act assessment, as it was in *United States v. Bornstein,* 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976), where the false markings supported false invoices. If the false markings in this case had been devised to deceive Government inspectors in checking out the logs, before plaintiff was allowed to remove them from the forest, there might be a different and closer case. Here, however, their use was only to deceive the forest rangers making a post audit of the stumps after the cutting was over. This is comparable to a jewel thief leaving a paste gem behind so that his theft of a real one will not be so soon discovered. It is still larceny.

The *Bornstein* opinion, in characteristic present day style, has its most important statement, for our purpose at least, in a footnote. This is footnote 8, at 313, 96 S.Ct. at 530, reading:

This Court has noted that in construing § 5438 [of the Revised Statutes] "we are actually construing the provisions of a criminal statute. Such provisions must be carefully restricted, not only to their literal terms but to the evident purpose of Congress in using those terms, particularly where they are broad and susceptible [of] numerous definitions." *United States v. McNinch,* 356 U.S., at 598, 78 S.Ct. 950. See also *Rainwater v. United States,* 356 U.S. 590, 592–593, 78 S.Ct. 946, 2 L.Ed.2d 996.

It is explained earlier and in the references that the original statute was split up by the codifiers into civil and criminal sections, now entirely separate, but having been originally one. The definitions of the penalized acts must receive the strict construction of a criminal statute. An alleged offense, to generate a penalty, must pass both halves of a dual test. It must meet the literal language, *and* it must conform to the purpose judges suppose the Congress had in mind. The alleged liability of Mr. Hageny utterly fails to satisfy either part of this standard, or standards.

The defendant apparently would have us hold that the above analysis is superseded by the dictum in *United States v. Neifert-White Co.,* 390 U.S. 228, 232, 88 S.Ct. 959, 961, 19 L.Ed.2d 1061 (1968) "that the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." This statement one might say cannot be of the highest authority, because it is not in a footnote, but in any case the later footnote in *Bornstein* shows it cannot have been intended to overrule prior authority in the

premises, or if it was, it is now overruled in its turn.

In *United States v. McNinch,* 356 U.S. 595, 599, 78 S.Ct. 950, 952, 2 L.Ed.2d 1001 (1958), the Court of Appeals for the Third Circuit is quoted with approval as saying

[T]he concept of a claim against the government normally connotes a demand for money or for some transfer of public property.

Mere larceny does not meet that standard, whether or not associated with an effort to disguise the theft or defer its discovery by false marking. It does not meet the literal language, nor does it come within the legislative purpose so far as the record as to that has come down to our time.

I am uncomfortable with the trial judge's analysis of the facts in his part III B. I am compelled to admit that our Rule 147(b) has a special application to a case such as this, where the credibility of witnesses is so large a factor. Moreover, the "clear and convincing evidence" rule, that was rightly applied, imposes on the defendant, which seeks to assess the penalties, more than the ordinary burden of proof. Indeed, when our trier of fact has rejected the proof that a penalty has been incurred, as insufficient, to reverse him would be almost tantamount to reversing an acquittal by a jury in a criminal case, which we all know cannot be done. And we are construing what is virtually a criminal statute here.

I think the trial judge has failed to give proper weight to the rule that demonstrated false statements by an accused, when his conduct is questioned, are to be taken as evidence of a consciousness of guilt. *United States v. Strickland,* 509 F.2d 273 (5th Cir. 1975, op. by Nichols, J., sitting by designation), and cases cited.

In Finding 15(d) (adopted but not printed by the court), I read:

At the meeting on December 11, plaintiff was aware that the Marvins had painted the three trees in question because the Marvins had told him they had done so. However, plaintiff did not tell Keppen this fact at any time. Instead, plaintiff told Keppen that the trees were painted by someone out to get him. Indeed plaintiff advised Keppen he (Keppen) could have painted the trees. * *

Keppen was the forest ranger who first discovered the false painting of the trees. The trial judge also found that plaintiff lied about tree marking procedure in Finding 19(b). In Finding 19(g) the trial judge found that plaintiff testified that no complaints were ever made against him respecting his logging operations, whereas the record showed the Wisconsin State Division of Forestry and Recreation had made such a complaint and had debarred him from bidding on future sales of timber from state forests.

I would have been comfortable with a finding that whatever otherwise was deficient in defendant's proofs was supplied by these evidences of consciousness of guilt.

The trial judge in my view greatly overemphasizes the inferences to be drawn from the fact that defendant failed to offer the testimony of two witnesses it said at pretrial it would produce. It may be a legitimate inference that, if put on the stand, their testimony would have been adverse to defendant, but it is not legitimate to infer that such testimony would have been true. The case cited, *Estate of Ridgely v. United States,* 180 Ct.Cl. 1220 (1967), is a decision by Trial Judge Maletz (now of the U.S. Customs Court) and I concurred in its adoption per curiam. The holding relied on is in a footnote, which, as always, may be supposed of higher authority than the text. The witnesses not produced, though promised, would have testified as to their expert opinion of the value of a parcel of real estate. It was a tax case. They were not, like the missing witnesses here, involved in the *res gestae.* Defendant was not required to produce witnesses not connected with it or under its control, and presumably hostile, whose testimony, if favorable to defendant, would have incriminated themselves. In general, a party represents to the court that the witnesses it calls will give veracious testimony which it cannot attack. The special exceptions to this rule

includes chiefly those whom a party by force of circumstances must produce. The court can, at its discretion, treat such witnesses as hostile, allowing the party calling them to cross-examine them as if the adverse party had called them. Normally, a party need not call hostile witnesses, and if he does, he adopts them as his own.

Defendant accepts the finding of 278 misappropriated trees for the purposes of its first counterclaim, but attacks it under the second, solely for the purpose of sustaining its witnesses. The trial judge discredits them on the ground the total number of trees they claimed to have mismarked greatly exceeded the numbers found, only 52. Defendant explains this by saying that when making his count, the forest ranger did not know that the miscreants who mismarked the trees simulated old paint by mixing motor oil with it. This seems to me a sufficiently plausible explanation why more mismarked trees were not found, to avoid discredit to the witnesses. At any rate, we all know it is human nature to exaggerate our sins once we start confessing any of them. This exaggeration does not prove we are free of sin.

The entire set of circumstances convince me that plaintiff was privy to the mismarking. He was the principal beneficiary of it. It is hardly believable that the cutter-skidder crews would mismark without his knowledge, since he could readily discover, disown, and expose their misdeeds if not in complicity. He falsified when the forest ranger first tumbled to what was going on. I think the defendant made a much stronger case than the trial judge allows. On a preponderance of evidence test, I think defendant would have won its second counterclaim, supposing the statute covered the case it tried to prove. I have already explained the reasons, as things are, that possibly would cause me to suppress my disagreement with the trial judge, if I had to rule on the fact issues. But they are moot in view of my construction of the statute.

Further, I think defendant's counsel is entitled to this much acknowledgement of the strength of his case, in view of plaintiff's attack on him as conducting a witch hunt or vendetta. It is asserted against him as an offense, that he traveled up into the Wisconsin woods, looking for witnesses. As a taxpayer, I would hope all Government counsel were so zealous. But there are easier ways of winning a lawsuit, than to persuade rural characters to testify against a rural claimant.

Since I wrote the above and circulated it to my colleagues on the panel, my attention was invited, in a different context entirely, to the recommended decision of Trial Judge Schwartz, filed August 16, 1977, in *O'Brien Gear & Machine Co. v. United States,* No. 105–72, in which he holds the "claim," as he calls it, of the plaintiff for redetermination of its Renegotiation Act liability, to be forfeit for fraud in the prosecution under 28 U.S.C. § 2514. He gives a broad construction to the word "claim" as used in that statute, which, as he shows, has been part of the statutory framework of Court of Claims jurisdiction since 1863. He emphasizes that the "claim" is "a word of many meanings, to be determined in the context of the purpose of the statute in which it is found."

Since the plaintiff has noted its intent to except, and the case will come before a panel of this court at some future date, it would be inappropriate for me to express either agreement or disagreement with Trial Judge Schwartz, and I do not do so. But I deem it necessary to notice his opinion to this extent: I wish to make explicit what was only implicit in my concurring opinion, as previously written, that the meaning of the word "claim" in the False Claims Act, 31 U.S.C. §§ 231–235, is made narrow by special considerations applicable to that statute and, so far as I am aware, no other in which the word is used. Therefore, I do not consider that my views about the False Claims Act commit me to any particular construction of any other Act or Regulation in which the word "claim" is used.

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court

and made a part of the judgment herein, the court concludes as a matter of law that defendant is entitled to recover on its first counterclaim the sum of three thousand four hundred eighty-eight dollars and eighty-four cents ($3,488.84) and that defendant is not entitled to recover on its second counterclaim and special plea in fraud and said second counterclaim and special plea in fraud are herein dismissed. The court further concludes, implementing its judgment order of January 9, 1976, in this case, that plaintiff is not entitled to recover on the claims asserted in his petition and that said petition is herein dismissed.